with our first case. It's a couple of consolidated cases, numbers 20-13091 and 20-14377, both United States v. Elizabeth Young. Mr. Feldman. Thank you, your honors. Thank you, your honor. Jordan Rosenbaum, Judge Monasco. I'm joined here today and have the pleasure of representing Elizabeth Peter Young, along with counsel Marisol Descasso. So thank you. I'm going to devote the majority of this oral argument to addressing restitution and forfeiture and not Ms. Young's convictions. That might seem a little abnormal or anomalous to your honors, but there are two reasons why. First, we believe that our briefing on those issues provides a sufficient basis for reversing the conspiracy convictions and the anti-kickback statute payment, not receipt convictions, because she was acquitted of all the receipt charges. And second, because Ms. Peters Young is actually released, has been released from prison. She's at liberty. So just as there's no way to put the horse back in the barn, I don't have any supernatural powers that allows me to erase the time that she's spent in prison just through oral advocacy. But before I get to restitution and forfeiture, there are two things I want to address with the court. First, there was insufficient evidence of trial that Ms. Young paid Desiree Mitchell indirectly by paying her boyfriend at the time, Tim Mitchell, compensation for marketing drugs for last pharmacy to induce Desiree to revert Dr. James's patients at his medical practice to drugs for last pharmacy. Why? Because Desiree was not the relevant decision maker. Testimony at trial from Grace Anderson, who worked Dr. James's office up in Atlanta, supported the conclusion that Dr. James was the relevant decision maker. Dr. James, not Desiree, kicked or vetted the pharmacy before sending his patients, his workers' comp patients, to the pharmacy. That was Grace Anderson's testimony at trial. You can pay kickbacks through a conduit, can you not? For example, a relative of a decision maker, say, listen, just to try to keep things on the low, I'm going to pay your husband or your wife, and you'll make these referrals, and there's no payment directly to the actual decision maker, but the payments are made to the spouse, let's say. That could be, it seems to me, that could be a violation proven of the anti-kickback statute. You are paying the kickback for the referral, you're just directing the payment to a third party. Oh, don't pay me, pay my son, pay my daughter, pay my wife, pay my partner, pay my friend. Right, and I agree with your honor, but I would agree with your honor in a different circumstance, where the indirect payment is going to the relevant decision maker. So, I'll give you an example. So, for example, if Desiree was married to Dr. James, and they shared the same bank account, there's going to be an indirect payment to Dr. James, who's the relevant decision maker, that has the power and the authority to refer those prescriptions to the particular pharmacy that he's selecting. That's not what happened, that's not what the evidence showed. I mean, but there was evidence that she interacted with the patients, interacted them to use the particular pharmacy, wasn't there? There was evidence that Drugs for Less Pharmacy, the owner of Drugs for Less Pharmacy, who was never indicted in this case, had discussions with Desiree Mitchell about checking in on whether or not the patients had prescriptions. So, you can choose to spend your time however you wish. I will tell you, I have questions about restitution. I think that's a very difficult issue, but I don't want to force you to have to address it if you'd rather keep addressing sufficiency. Thank you, Your Honor. So, she was in a unique position to take patients that she had from the clinic that she owned, hemophiliac patients, and just sort of walk them over to the special pharmacy. That is not the case that you have with respect to Desiree Mitchell in Ms. Young's case. I'll move to restitution. So, how does the government prove, Mr. Feldman, restitution in a pure anti-kickback scenario? Does it depend on whether or not the services were medically necessary? I think it's even more fundamental than that. I don't think that the government can show restitution or prove restitution in a kickback case where no fraud is alleged. So, in other words, there is no actual loss sustained by a government victim as defined by the restitution statutes in a kickback case where a fraud offense is not returned by the grand jury, unless the government proves lack of medical necessity by preponderance of the evidence. So, what if the government proves that a generic would have been just as good and that's what likely would have been recommended in the absence of the kickback scheme? Can they recover for the difference between the on-brand or the label name and the generic? I think that's a possibility, but I don't know how you would, but sticking to the facts in this case, you would have to go through every single prescription for Tericin and Litaprobe and the specific patches and compare those prescriptions and the medical necessity of those prescriptions to those particular patients. Or you could, I mean, you could do a sample, right? Because restitution doesn't have to be exact. It just has to be a reasonable estimate. Right. And the other thing I'll say is these are specialty medications, but they're over-the-counter medications. This is not like a compounding case where someone came in and got a... But what difference does that make? Because if I'm a patient and I see a generic that's one third of the price of the other, the label name, I'm probably going to pick the generic. I mean, even, you know, especially if I don't know off the top of my head how much of an insurance is going to cover, I'm probably going to pick the generic. Well, the insurance in this case covered everything because there are no copays with respect to... Right. And is there any evidence about whether the patients knew that, you know, at the time that they went to get it? Is there any evidence that they knew what? That they had a choice in medication? Is that what you're asking? That the insurance would pay for everything. I mean, I'm sure they could have found it out if they wanted to. But, I mean, normal behavior for most people is if there's a generic equivalent and it's truly an equivalent, they're usually going to go with the generic equivalent unless... I mean, that generally seems like a reasonable assumption. We were asked about some evidence from the trial. There is evidence in the trial that these patients obviously knew what drugs they were getting, that the drugs worked, and that they knew that they were getting them from a particular pharmacy, Drugs for Less, and then later on Gateway Pharmacy in Alabama. In terms of generic versus specialty, because we were not allowed to go into these particular issues, both at trial based on the orders on motions and limiting, which were correct orders for purposes of trial, we weren't able to go into these issues at a restitution hearing because there were subpoenas that were quashed with respect to getting the particular medical records to allow an expert to come in and do a medical necessity evaluation. But I think that getting back to sort of the framework here, the framework here with respect to restitution is, to me, that if you have an alleged fraud in the indictment, you can't just make an after the fact determination that there's fraud in the case. And that's what happened here. So you have to show that all these different prescriptions were medically unnecessary. You have testimony from Harvard educated doctors, Dr. Dutte, during trial that he prescribed his medications. There is not one medication, one prescription, one medical record that came into question during the course of the trial or whose medical necessity was questioned, which is the exact same circumstance that you had in the United States versus LIS. And to a certain degree in Magella. Does the restitution have to be circumscribed by the count of conviction? Or can restitution be broader than the count of conviction if proven? I don't believe that it can be broader than the count of conviction if proven. In other words, you can't make it after the fact determination that this case is now a fraud case. Why is that the case? It could have always been a fraud case. It just might not have been charged as a fraud case. But why isn't that part of the relevant conduct when we're figuring out what restitution should be? Well, there is no relevant conduct in restitution like loss calculations or improper benefit calculations. Those are calculations that you make with respect to the sentencing guidelines. Restitution statutes are narrowly tethered to the offense. They talk about sustaining losses or victim sustaining losses as a result of the offense. The offense here is the anti-kickback statute. Magella, LIS, and Bain. Magella is a kickback case with some fraud. Bain is only a fraud case. And LIS is a kickback case. In none of those cases did this circuit ever hold or determine that you can establish a loss of any kind based on fraud solely on the kickback count in the case. Stephanie, can you please add three minutes for Mr. Feldman? We want you to address forfeiture a little bit so we can ask your colleagues on the other side about it as well. Can I start by asking you a question about that? Is it your position that after honeycut there's no more joint and several liability at all? Or is there still joint and several liability in some cases? I think our position is that there's still joint and several liability in some cases. And what is the rule that you would use to determine when there is joint and several liability and when there is not? Well, in a kickback case, I want to be responsive to your Honor's question, but in this particular kickback case, we have sort of some factual nuances, right? The money is moving from the pharmacy, at least with respect to drugs for less. The money is moving from the pharmacy directly to Ms. Young's company's bank account. And then that money is going to both Tim Mitchell and another sales representative. Mrs. Young was held accountable in the forfeiture amount for all of those monies that went into her account. And I don't mean to cut you off, but you don't have a lot of time. And so we have to articulate a rule. And maybe you're saying the rule is we look at every case, we decide every case on its own, and every case is going to have its own rule. There's no general rule. But it's always easier if there is a general rule or if not a general rule, some general principles that we apply to every type of case. And what I'm looking for your guidance on, because we do have to write an opinion, is what you think those general principles or that general rule would be when we're determining whether or not joint and several liability applies. I don't think the joint liability can apply to the narrow circumstances here with respect to the kickback because of the fact that Ms. Young is not actually obtaining or acquiring or coming into possession. That's going into an account, but it's sort of like an escrow account. It's then immediately going to other sales representatives. So your rule would be she never actually touches it. I mean, it's technically in her account, but then it immediately moves someplace else. So she never actually touches it. Is that what your rule would be? That's what my rule would be. And also what would support that rule in this particular case is that the contracts were written that way. So when she engaged in the contracts with both the pharmacy and her reps, the intent of the movement of this money was to go from the pharmacy to her to the sub reps or the sales representatives. But if you have, think of, and I know the cases aren't exactly the same, but think of a drug trafficking scenario where the money goes to the person who was selling at a retail. And then that person, he or she gets the money for the kilogram of cocaine or the kilogram of heroin, then pays the people to whom, from whom he got the drugs at wholesale because they let him buy on credit. In that case, you impose forfeiture for the entire amount of the receipts by the retailer. So I get a kilogram of cocaine from a wholesaler. We've had a relationship. So the wholesaler says, you're good. I'll sell it to you on credit. When you get paid, when you sell it, you give me the. So, I sell a kilogram of cocaine and say, whatever the going rate is, $30,000, $40,000, and I'm buying it at 25. So, when I get to 40, a week later, I pay the 25 or the 20 or the 30 or whatever it is. What am I liable for in terms of forfeiture? Yeah, that's the problem with having a hard and fast rule. And that's the difficulty with looking at this in this particular case. But to answer your question, if you're applying my logic from the kickback, then you'd only be liable for the amount that he earned. So, I think it would only be $15,000 in your hypothetical. He did earn the full thing. It's just that he had a debt. Right. I understand your Honor's question. And the difference between your Honor's hypothetical and I think Ms. Peters-Young's situation is that that money was not money that she earned. So, if the pharmacy is paying $50,000, maybe only $10,000 of that is money that she earned from marketing. The other $40,000 is money that the other representatives earned from marketing. So, you're proceeding. I don't want to put words in your mouth. This is hard. But you're proceeding on like a net proceeds theory? A little bit of a net proceeds theory to a certain extent with respect to kickbacks. But more importantly, just on the idea that Honeycutt really only establishes this type of liability in situations where the person gets, acquires, or comes into possession of the proceeds. She did. You just say she got rid of it right away. And so, she never really enjoyed it. But she got it. If she had held on to the money and earned interest on it for five months before paying anybody else, would your argument be any different? My argument would be different. My argument would be different. This is more like… So, she gets a forfeiture judgment for the full amount if she kept it for too long a period of time. Well, she's earning interest on it at that point. She hasn't demonstrated an intent to relinquish it in any way. But she did relinquish it. She just held on to it for a little bit longer. Right. So, I think that would be sort of more akin to an escrow account example, except for you're not earning interest that nourished to your benefit. You're earning interest that has to go to… So, if you put it in a non-interest bearing account and you hold it for a year, and you pay everybody a year later to sort of hide the trail, are you on the hook for the entire amount that you received and put it in an account? I think that you would be. Why? You didn't earn any interest this time. I understand, Your Honor. I think that this… I think you have to look at the plain language of, you know, get, acquire, obtain, and sort of lead to sort of an absurd interpretation of those words. If someone is taking the money, it hits their account, and then what they do immediately after that is transfer it to someone else because it's, in effect, their money. So, you're advocating for the Thompson rule out of the Ninth Circuit, basically. Similar to that rule, yes. Okay, Mr. Feldman, we've given you enough time in taking you over, so thank you very much for the help. You've saved all of your time for rebuttal. Thank you, Your Honor. Mr. Dean. Good morning. May it please the Court. Scott Dean on behalf of the United States. With me at the Council table, I have David Turkin, who is the trial attorney. I'd like to just start first with the forfeiture issue since it's fresh on the mind. All right, so let's start there. So, we're talking about… Our cases are a little bit of a mess, right? That's probably an understatement. We have the first case that says, in a kickback case, you can use the amount of the kickback as a proxy for restitution. Second, so everything. So, at least if you read that case by itself, you're like, okay, that's a pretty… right or wrong, that's a pretty settled rule, easy to apply. Next case comes along and says, nah, not so fast. Because in that case, the defendant agreed that he was liable at the very least for the amount of the kickback. So, that case is limited to its facts, its procedural scenario. So, unless you prove some sort of loss, you don't automatically get to hook restitution as a proxy for the amount of the kickback. And then the third case is sort of even more messy. And the fourth case has been vacated by the Supreme Court. So, for me, it's a mess. If you have a kickback in a… So, I'll ask you the same question I asked Mr. Feldman. If you have a kickback in a medically necessary scenario, is restitution available to the government? It can be, Your Honor, yes. When? So, the government has suffered no loss. So, our reading of the list, Miguel, is that when there's a variable rate system, so when the government program pays… No, no, no, no. I want to start on an easier hypothetical. Then we'll get to this one with the variable and the generic and the higher price brand. So, think of a case where it's just a generic, but the generic is really expensive and it's just one. And it's medically necessary, but you're paying kickbacks. So, there's criminal liability. In that scenario where it is shown… So, it's a different set of facts in here. It is shown that every prescription was medically necessary, no variable payment. The violation is a payment or receipt of a kickback. Is there restitution? Generally speaking, no. And I think it's based on the list, Miguel. Okay. So, now tell me about the variable payment scenario. Right. So, in the variable payment scenario, the idea here is that there's an abuse going on with the… Basically, the reason that kickbacks are being paid is for profits and not for patient care. And so, the assumption is… And the assumption that was baked in Miguel was that every dollar that was paid in kickbacks was assumed to be a dollar that was overcharged to the government. And that's one way that we can measure the extent of the harm that the government's program suffered. And I do want to step back for a second and say that kickbacks generally do harm the government. There's no doubt about it. That's why it's a criminal offense. Well, they do harm the government. That's why you said it's made criminal, but it doesn't mean that there's a loss. If you commit Medicare fraud and Medicare pays a fraudulent claim, there is both a general abstract harm to the government and a pecuniary harm to the government. It's not necessarily the case in a kickback scenario. Correct, Your Honor. In the second scenario, though, and the way that we view these two cases, Liss and Vigela, is that when there's kickbacks paid and then there's some other conduct, including fraud, that is shown by the government by a preponderance of the evidence, then the kickbacks that were paid are an appropriate measure of the harm that was incurred by the government program. There's really… What if the kickbacks are more than the difference between the cost of the name brand and the generic, which we all agree was medically necessary? How is the government harmed in that way beyond the difference between those two? Well, in that case, Your Honor, if… So the assumption here is, and if I'm understanding correctly, you're saying the kickbacks that were paid by two, let's say, in a hypothetical Miss Young were greater than the difference between a Bengay and a Lidipro. Yes. I think there's… The reason why the government's harmed here is because the whole scheme was to keep driving refills and prescriptions to the pharmacy. And so… But you haven't said that any of those… There's no evidence that any of those prescriptions were medically unnecessary. In other words, we all agree that all the patients required that drug, whether it was the name brand or the generic, right? So how… So in any case, we know that at a minimum, if there were no kickbacks, at the very minimum, every patient would have been prescribed the generic. So how can you be harmed in an amount that takes you under the generic? Well, Your Honor, I think… And I don't… Of course, those aren't the facts of the case. And I think in that case, perhaps there's a good argument that the kickback amount would overstate the amount of restitution. And so then how would we… As a general… Right. And how would we decide what the amount of restitution is? Well, in that case, because like you said, there's a difference between the generic and the non-generic. And so your rule is that whichever is less, the amount of the kickback and the difference between… Well, no. Our rule is however the court can make a reasonable estimate of the harm. And so in that case, there's an easier way for the court to make a reasonable estimate of the harm, and that's subtracting the difference between the generic and the non-generic. Does the government have to provide any evidence that the generic would have been the drug that was either prescribed or purchased, I guess, by the patient in the absence of the kickbacks? And if not, why not? I don't believe so, Your Honor. And I think, like I said, this is about estimating the loss amount and a reasonable estimate of the loss amount. But how do we know that that's a reasonable estimate of loss amount? I mean, if… No, maybe it's the situation where the patient says, I could get either. I'm aware of my benefits. I could get the generic or I could get the name brand. And even if it seems like there's no difference between the two, I'd really rather have the name brand. I feel more comfortable with it. I know it's been tested. I know that it's a reputable company that produces it. How can we say that there was actually a loss? Well, we can say that… I mean, and if we're speaking in just hypotheticals and not about the facts of this case, we can say that there's an actual loss by the fact that they're, again, they're paying kickbacks. And so patient care is not being considered first in prescribing these to begin with. So when the medical necessity… I'm sorry, when the prescription is written at that point, when kickbacks are involved, medical necessity is… But what difference does it make if we're all in agreement in the first place that it's medically necessary? Well, if we're all in agreement that it's medically necessary and kickbacks are being paid and there's only one prescription filled, then I think it's hard to measure harm. I think in this case, the difference is these were refilled hundreds of times or dozens of times for some patients. And so the idea here is… And maybe… How many times that it was refilled make a difference to whether we can assume that the patient would have obtained the generic or the generic would have been prescribed? Well, because the number of refills was based on not the patients wanting it, was based on the kickback scheme and making money. So you're saying it wouldn't have been prescribed, it wouldn't have been refilled the number of times, but for the kickback scheme. Is that right? Because that's not what I understood you to be saying in the district court. I may have misunderstood. That's why I'm seeking a clarification. I thought everybody… I thought there was no challenge to the idea that the drugs that were prescribed were medically necessary, regardless of how many times they were prescribed. But if I'm mistaken about that, that would be important for me to know. Yeah, you… I believe the argument that was made in the district court was that these were medically… were not medically necessary. And that's… A doctor prescribed something which the patient did not need. This case has a wrinkle because under your theory as articulated today, the brand name is not medically necessary, but the treatment is medically necessary. Right? Well, that's not exactly our theory. Our theory is that the medication was not medically necessary to begin with. At all. I didn't understand the argument in the district court to be that either. Because the argument… You presented evidence in the district court that none of these prescriptions were medically necessary for anything? The assumption was that Desiree Mitchell was writing the prescriptions and by doing so… No, no. I don't want assumptions. You've got the burden of proof on restitution at the front end. So, did the government present any evidence that these prescriptions were medically unnecessary for the condition, whether it's brand or generic? Yes, that was our theory in the district court. Did you… Did the government present any proof? Yes. What was the proof? So, we had emails from Young saying that Desiree was writing the prescriptions. There's emails from Desiree saying she has 26 scheduled this week, 21 lined up. And the inference from those emails being that these were… She already knew that she was going to be giving these patients prescriptions without them ever seeing the doctor. And our theory in the district court was that before these patients stepped into the door, they knew… They being Desiree, Young, Tim, and the pharmacies, they knew that these patients would be getting the prescriptions. I haven't gone into the trial transcript, so I don't know the answer to this question. But was there evidence presented at trial, for example, from any of the patients that they didn't need this medication? No, there was no evidence presented at trial of that. Was there any expert testimony presented at trial that any of these patients didn't need the medication, whether brand or generic? No, and that was barred by a motion to eliminate. That's a big assumption that you're asking a district court to make. And that's the assumption that the district court did make. And so, on this… At this stage, we're asking whether that was clear. I think, yes, you're right. There was no evidence at trial, but from all these facts, the district court sat through the 10-day trial. It litigated pre-trial motions, post-trial motions, sentencing, forfeiture. Through all of this, the district court, and this is all in the record, gleaned enough by a preponderance of the evidence to make a finding that this was not just a kickback scheme. This was also a fraud scheme. Fraud because of the upcoding? You're telling me the district court made a finding of fact that these patients did not need the medication at all? The district court made a finding of fact that there was fraud involved. That's not my question. Fraud can take a lot of forms. And so, you can have a fraud where it's upcoding the way Medicare fraud began way back when. When criminals were a lot less daring. So, real patient, real need, real prescription. But instead of charging at a $30 rate, you charged at a $70 rate, so you upcoded. But there was a real patient, and there was a real need, and there was a real medication. And so, the loss was the baseline charge that should have been made and the upcoded charge. So, you can have that sort of fraud here, which is the difference, the variable between the generic and the brand. Which is, I thought, where the government had gone in the district court. But now you're telling me it's even a broader fraud that all of these prescriptions were just fraudulent. That none of these patients needed the medication no matter what form. That's the government's theory? That was our theory during the restitution hearing, yes. And that's our theory. And the district court made that finding? You think? I read the very long transcript, right, where there's a very good discussion between the lawyers and Judge Ruiz. And I thought the fraud finding was based on the need for generic and the going to the more expensive, more profitable, more lucrative brand name. There was certainly discussion about that. I read our theory as being that this was fraud to begin with. That the whole idea here was that Desiree was sending prescriptions to the pharmacies. Let me ask you a specific question about how the district court made the finding that you're talking about. My understanding was that the district court believed that the defendant had not proffered any evidence to show that the medications were medically necessary in a way that would offset the total amount. Why did that not place the burden incorrectly on the defendant? I mean, it's the government's burden, right? Yeah, so the government, and this goes back to, this is derived from a general fraud idea that where there's pervasive fraud in a fraud case, the government shows, okay, here's the loss amount. This entire scheme was fraudulent and it's on the defendant to show, hey, maybe this one was medically necessary, this one was medically necessary. And so the idea was similar here in that the district court said this was a fraud. Essentially, by performance evidence, this was a fraud scheme. Defendant, it's your burden now to show an offset. So that feels circular to me, right? So if in order for the medical necessity question to be answered, the government's offered an assumption, really an inference from evidence. Did the district court not sort of assume the truth of the conclusion as the premise for making the defendant put in evidence about medical necessity? I'm not sure I understand your question, Your Honor. Did the district court assume? So the reason the district court put the burden on the defendant is because the district court said it was a fraud case. The reason the district court said it was a fraud case is because it assumed, although the government didn't have evidence about medical necessity, it drew the inference that you're suggesting that it drew. Yeah, so I think medical necessity, I think where it gets confusing is medical necessity or a lack of medical necessity is evidence of fraud, but it's not the ultimate fraud finding, which is a little bit different. I think the district court made that fraud finding not just based on assumptions about the necessity of these medications, but also based on the actions of Desiree Mitchell, which was proven through the testimony. Tim Mitchell, her husband, testified that she was a so-called unicorn because she could write prescriptions. She could send these prescriptions to the pharmacies. That was the whole scheme. The scheme was based on Desiree Mitchell's access to these patients and her ability to write prescriptions. There was also testimony from Dr. James's medical assistant in which she said that Dr. James at times presigned prescriptions. And so I know that we're kind of grasping at different straws here, but when it's all taken together, when the district court views all those things, plus all the heavily litigated pretrial motions, post-trial motions, orphature hearing, sentencing hearing, the district court did not clearly are making this determination. I see that I've run out of time. Actually. We're going to stay for a little while longer. Stephanie, can you add four minutes to Mr. Dion? So I have some questions about forfeiture. And my question for you is sort of the opposite of what I asked your friend on the other side of the aisle. So Judge Jordan asked about the scenario where you have a low-level cocaine dealer and the cocaine dealer sells the cocaine for $40,000 and pays $25,000 to the supplier who's at the top of the chain, keeps $15,000 for himself. And what is the forfeiture on that? And it seems like in Honeycutt, the analogy that the Supreme Court used would say the forfeiture on that is $15,000. Do you agree with that? I think the analogy is a little bit different in Honeycutt because Honeycutt was talking about sort of a drug runner as opposed to someone that's getting drugs on loan from a wholesaler. It's a college student. Is it the college student who's selling the drugs to his friends? Right, the college student sells drugs to his friends. Well, if he's selling the drugs to his friends, I mean, isn't he holding the value of them? I mean, he's holding the full value of them when he's selling it, and he's only getting some percentage of that, right? Well, and I'm not sure that the facts were fully fleshed out in Honeycutt, but I think the idea was he took in $3,600 or so in the course of a year. And those were the gross proceeds traceable to his offense. And so in the other example that Judge Jordan posed where the drug dealer is taking in gross proceeds of $40,000, those are gross proceeds. All that the statute asks us to do, and this is specifically in the health care fraud context, I can't. Well, so I'm a little bit. Okay, go ahead. That's right. It just asks to trace the gross proceeds traceable to the commission of the offense. And so there's no net proceeds idea in there. There's no subtraction of costs. This is just gross proceeds, just like a business will take in gross receipts from their customers and then pay their employees and pay their overhead. The same idea. The criminal scheme brings in gross proceeds, or in this case, in the drug dealer's case, the criminal offense brings in gross proceeds of $40,000. And then whatever happens after that is a different story. So the full $40,000 would be forfeitable. It may be that I misunderstood the example, the analogy in Honeycutt, and I'll take another look at it. But I think what you're saying is that in Honeycutt, at no point in time did the student ever hold more than a total of $3,600 for the year. I think that's right. Yes. Okay. If the student did hold more than a total of $3,600 for the year, then that would be a different situation. It would be similar to what we have here, wouldn't it? Yeah, so if the gross proceeds that the student took in were greater than $3,600, then we would say the gross proceeds traceable to the commission of his drug dealing offense would be whatever that number is. And of course, I'm just talking about 982A7, the health care fraud forfeiture statute. I know the language is similar. I know, but we have a statute. We have a case that says we interpret it the same way. Right. Thank you. Okay, Mr. Dionne, thank you very much. Thank you. Hi again, Your Honors. Andrew Feldman on behalf of Ms. Peters-Young. I want to address a couple of things that were asked on the restitution issue, and I want to hope to clarify a couple of things, too. Your Honors asked several questions about variable versus generic and asked some questions about the trial record. You know, I'm in the unique position of being the trial lawyer in this case, or one of the trial lawyers in this case, and also the appellate attorney in this case. So at the trial level, there was no discussion, no evidence, no testimony whatsoever about medical necessity. Both parties were barred from introducing that on properly issued orders, and that there were no discussions about, quite frankly, about medical necessity other than argument during the restitution hearing. But I want to get into the variable payment issue because I think there are some further assumptions that we're making. First of all, I'm not sure I understand what we mean by variable payment in this particular case because we're talking about the Office of Workers' Compensation. They don't work on a variable payment schedule. They have a flat fee schedule, which is evidence to the testimony of Timothy Ravineau from the Office of Workers' Compensation. And I'm not sure that there is a generic drug. There's no testimony about a generic drug that these particular patients could have gotten from Dr. James or the other doctors. There was testimony from Dr. Dutte, our defense witness, testifying about how these drugs work for his patients and the reasons why he prescribed them and the reasons why he went to a special pharmacy like Drugs for Less to have them dispensed to his patients. If that's the case, if the record has no evidence whatsoever of a generic equivalent, then the district court's fraud finding, whatever that, whether it stands or not on appeal, is more what Mr. Dion said. Because the district court said, I find that there's fraud by a preponderance of the evidence on the medical necessity issue. So if there's no difference between a brand and a generic, then what Mr. Dion said in characterizing the district court's explanation seems more correct. If the district court found fraud by a preponderance of the evidence on the issue of medical necessity, whether that's supported by the evidence or not is another question. What the judge meant to say is these drugs were not needed by the patients, right? Is that what the district judge said? Quite frankly, your honor, I don't I don't read that from your honors from Judge Ruiz's order. I know you think it's wrong, but tell me what you think Judge Ruiz meant when he said, I find fraud by a preponderance of the evidence with regard to medical necessity. What did he mean? I think that he meant I think he was doing a comparison between. I think he was confusing this case, quite frankly, with a compound, a little bit with a compounding case. That's why there's a lot of analogies to the grow case in the in the underlying decision. But there is a quote from the restitution hearing where he compares it. Wasn't there evidence of trial that this is like Bengay? And the reality is there was no evidence trial about anything dealing with Bengay. And there's no evidence about. Well, first of all, there's no evidence from the government saying that Dr. James or any other doctor should have prescribed a generic drug. These doctors, these doctors, the other assumption that could be made if we're going to make assumptions is that these doctors prescribe these drugs for these particular patients because they worked for their patients. Whereas a generic that a generic is even available may not have worked to cure their pain. Also, because these are specialty medications, they were reimbursed at a higher level by the Office of Workers' Compensation. But there was a big. Describe the discrepancy between how much they actually cost to purchase and how much they were reimbursed at. So there's no evidence about how much a generic would have been would have been reimbursed as well. So let's say that a generic costs fifty dollars. It could be still be reimbursed for six hundred dollars if these particular drugs cost one hundred dollars and are reimbursed. I think around eight hundred and fifty to nine hundred as Mr. Ravana testified to. There's no evidence about any of that. There's just sort of assumptions with respect to what the government has said. So we maintain our position with respect to all the arguments we've had with respect to restitution, that the restitution amount in this case is zero and the findings to be remanded. Right. Thank you both very much.